08-5119-cv
Bakalar v. Vavra

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2009

(Argued: October 9, 2009                                        Decided: September 2, 2010)

Docket No. 08-5119-cv

_____

DAVID BAKALAR,

*Plaintiff–Counter-Defendant–Appellee*,

—v.—

MILOS VAVRA AND LEON FISCHER,

*Defendant–Counter-Claimant–Appellants*,

SCHENKER INC. AND SCHENKER & CO. A.G.,

*Counter-Defendants.*

_____

Before:
  CABRANES and LIVINGSTON, *Circuit Judges*, and KORMAN, *District Judge.**

_____

An appeal from a judgment of the United States District Court for the Southern District of New York (Pauley, *J.*), after a bench trial, declaring that David Bakalar was the owner of an untitled drawing by Egon Schiele.

VACATED AND REMANDED. Judge Korman concurs in a separate opinion.

---

\* The Hon. Edward R. Korman, Senior United States District Court Judge for the Eastern District of New York, sitting by designation.

RAYMOND J. DOWD, (Carol A. Sigmond, Thomas V. Marino, *on the brief*) Dunnington, Bartholow & Miller LLP, New York, N.Y., *for Defendants-Counter Claimant-Appellant*s.

JAMES A. JANOWITZ, (William L. Charron, *on the brief*), Pryor Cashman LLP, New York, N.Y., *for Plaintiff–Counter-Defendant–Appellee*.

EDWARD R. KORMAN, *District Judge*:

This case involves a dispute over the ownership of a drawing by Egon Schiele (the "Drawing") between plaintiff David Bakalar, the current possessor of the Drawing, and defendants Milos Vavra and Leon Fischer, heirs to the estate of Franz Friedrich Grunbaum ("Grunbaum"). Although the Drawing was untitled by the artist, one of the descriptive titles by which it is known is "Seated Woman with Bent Left Leg (Torso)."

Vavra and Fischer allege the following facts in their complaint. The Drawing was one of eighty-one Schieles that were included in a collection of 449 artworks owned by Grunbaum, an Austrian cabaret artist, and kept in his apartment in Vienna. Grunbaum was deprived of his possession and *dominium* over the Drawing after being arrested by the Nazis and signing a power of attorney while imprisoned at Dachau. The power of attorney, dated July 16, 1938 (four months after his imprisonment), authorized his wife Elisabeth "to file for me the legally required statement of assets and to provide on my behalf all declarations and signatures required for their legal effect according to the statutory provisions, and to represent me in general in all my affairs." (A-936.)

The statement of assets, to which the power of attorney referred, required Jews to list all of their property. The information was then used by the Nazis to impose confiscatory taxes and

2

penalties of various kinds.[1]  The power to represent Grunbaum "in all [his] affairs" enabled the Nazis to compel Elisabeth to dispose of Grunbaum's assets for the purpose of paying the imposed taxes and penalties.[2]  Indeed, in a report dated four days after the execution of the power of attorney, Franz Kieslinger, an appraiser for the Nazis with the Viennese auction house Dorotheum—which was "a prime selling point of loot[ed] art in Austria" (A-1265)—conducted an appraisal of the 449 artworks that Grunbaum kept in his apartment, including the eighty-one Schieles.  On August 1,

---

[1]  "Of particular significance is the ordinance dated April 26, 1938, which required Jews to register their assets and which covered both those who sought to leave the Reich [of which Austria was a part] and those who remained, with the Reich seeking to appropriate their domestically as well as their externally held assets."  Claims Resolution Tribunal: Deposited Assets Claims: Selected Laws, Regulations, and Ordinances Used by the Nazi Regime to Confiscate Jewish Assets Abroad, http://crt-ii.org/_nazi_laws/; *see also* Robert Gallately, *Backing Hitler: Consent and Coercion in Nazi Germany* 124 (2001); Otto D. Tolischus, *Goering Starts Final Liquidation of Jewish Property in Germany*, N.Y. Times, Apr. 28, 1938, at 1.

[2]  While the Nazis could simply have confiscated all of Grunbaum's possessions without a power of attorney, the manner in which they proceeded here reflected their practice of camouflaging theft with a veneer of legality.  Raul Hilberg, the preeminent historian of the Nazi war against the Jews, has written: "Lawyers were everywhere and their influence was pervasive.  Again and again, there was a need for legal justifications."  Raul Hilberg, *Perpetrators Victims Bystanders: The Jewish Catastrophe, 1933-1945*, at 71 (1992).  Indeed, the U.S. Consul General in Vienna at the time observed that "[t]here is a curious respect for legalistic formalities.  The signature of the person despoiled is always obtained, even if the person in question has to be sent to Dachau in order to break down his resistance."  *See* Lynn H. Nicholas, *The Rape of Europa: The Fate of Europe's Treasures in the Third Reich and the Second World War* 39, Chapter 2 n.30 (First Vintage Books ed., 1994) (quoting NA, RG 59, SD Cable 862.4016/2103, Geist, Berlin, to Secretary of State, April 11, 1939); *see also* Gallately, *supra* note 1, at 124.  Scholars have explained that respect for legalistic formalities was not a curious eccentricity.  *See, e.g.*, Henry Friedlander, *Nazi Crimes and the German Law*, in *Nazi Crimes and the Law* 16-17 (Nathan Stoltzfus & Henry Friedlander eds., 2008).  Instead, "obedience to legal forms strengthened [the Reich's] power.  Upstanding citizens felt a moral obligation to submit to the law's authority . . . . Resistance was immoral.  If any citizens felt unease about a particular policy, their pained consciences were salved via display of a suitably stamped document in pursuance to a decree."  Richard Lawrence Miller, *Nazi Justiz: Law of the Holocaust* 1 (1995).  In sum, the law "removed the question of the morality or legitimacy of the process."  Peter Hayes, *Summary and Conclusions, in Confiscation of Jewish Property in Europe, 1933-1945*: New Sources and Perspectives: Symposium 143, 147 (2003).

1938, Mrs. Grunbaum signed a List of Assets "for Franz Freidr. Grunbaum, according to Power of Attorney dated July 16, 1938." (A-933.) The valuation she placed on it was identical to that which Kieslinger had assigned it.

The manner in which the Drawing made its way from Vienna to Galerie St. Etienne, the New York art gallery from which Bakalar purchased it, is unclear. Grunbaum died in Dachau in 1941. The Registration of Death, a document filed in the district court of Vienna in which Mrs. Grunbaum reported the death of her husband, states that "[a]ccording to the deceased's widow, Elisabeth Sara Grunbaum, there is no estate." (A-982.) Mrs. Grunbaum was arrested by the Nazis on October 5, 1942, and died shortly thereafter in a concentration camp in Minsk. The Drawing was purchased along with forty-five other Schieles by Galerie Gutekunst, a Swiss art gallery, in February and May of 1956. The district judge found that the seller was Mathilde Lukacs-Herzl ("Lukacs-Herzl" or "Lukacs"), the sister of Mrs. Grunbaum. Later the same year, on September 18, 1956, the Drawing was purchased by the Galerie St. Etienne and was shipped to it in New York. On November 12, 1963, the latter sold the drawing to David Bakalar for $4,300.

Bakalar, a resident of Massachusetts, filed this action seeking a declaratory judgment that he is the rightful owner of the Drawing. The complaint was filed after a winning bid of approximately $675,000 for the Drawing at a Sotheby's auction was withdrawn, apparently because of a letter written on behalf of Milos Vavra and Leon Fischer, which challenged Bakalar's title. Vavra and Fischer, who have been formally designated by an Austrian court as the legal heirs to the estate of Grunbaum, are the two named defendants in this case. In response to Bakalar's complaint, Vavra and Fischer, who are residents of the Czech Republic and New York, respectively, filed counterclaims for declaratory judgment, replevin, and damages. After a bench trial, a judgment was

4

entered in the Southern District of New York (Pauley, *J.*), based on findings of fact and conclusions of law, which sustained the claim of David Bakalar that he was the rightful owner.

In his post-trial findings of fact and conclusion of law, the district judge reaffirmed his pre-trial ruling that Swiss law applied. *Bakalar v. Vavra*, 2008 WL 4067335, at *6 (S.D.N.Y. Sept. 2, 2008) (citing *Bakalar v. Vavra*, 550 F. Supp. 2d 548, 550 (S.D.N.Y. 2008)). Under Swiss law, "a person who acquires and takes possession of an object in good faith becomes the owner, even if the seller was not entitled or authorized to transfer ownership." *Id.* at *7. One "relevant exception to this rule is that if the object had been lost or stolen, the owner who previously lost the object retains the right to reclaim the object for five years." *Id.* The district judge proceeded to hold that, because Lukacs-Herzl "possessed the Drawing and the other Schiele works she sold" in 1956, the Galerie Gutekunst, as buyer, "was entitled to presume that she owned them." *Id.* Because Galerie Gutekunst was a good faith purchaser, and because the Grunbaum heirs had "not produced any concrete evidence that the Nazis looted the Drawing or that it was otherwise taken from Grunbaum," Bakalar acquired good title when he purchased the Drawing from Galerie St. Etienne. *Id.* at *8. Nevertheless, even if the Drawing had been stolen at some point prior to the Galerie Gutekunst's purchase in 1956, "any absolute claims to the property" by those from whom the Drawing was stolen "expired five years later, in 1961," pursuant to Swiss law. *Id.* at *7.

**DISCUSSION**

I

Because jurisdiction in this case is predicated on diversity of citizenship, New York's choice-of-law rules apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Before engaging in a choice-of-law analysis, we turn to the threshold question whether there is a difference

5

between the laws of Switzerland and New York upon which the outcome of the case is dependent. We conclude that there is a significant difference that is reflected in the laws and policies of these two jurisdictions.

**A. Swiss Law and Practice**

The preceding summary of the district judge's findings of fact and conclusions of law contain a description of Swiss law, to which we add only a few words. Under Article 934 of the Swiss Civil Code, as summarized by Bakalar's expert, "a buyer acting in good faith will *acquire valid title to stolen property* after a period of *five years*. After the five year period, a previous owner of a stolen object is no longer entitled to request the return of the stolen object from a good-faith possessor." (A-706) (emphasis in original). Moreover, as Bakalar's expert explained, Swiss law also presumes that a purchaser acts in good faith, and a plaintiff seeking to reclaim stolen property has the burden of establishing that a purchaser did not act in good faith. *See also In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000), *aff'd*, 413 F.3d 183, 186 (2d Cir. 2005); *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 717 F. Supp. 1374, 1400 (S.D. Ind. 1989), *aff'd*, 917 F.2d 278 (7th Cir. 1990). Significantly, according to Bakalar's expert,

> [t]here has never been a legal presumption that art works with a potential relationship to Germany during World War II (i.e. emanating from a German collection or created by artists deemed "degenerate" by the Nazis) would in general and *per se* be tainted, and that a dealer accepting such art works would automatically be subject to a heightened standard of diligence in the 1950s. Such a presumption did not in the 1950s and does not today exist in Swiss law.

*See also* Final Report of the Independent Commission of Experts (Bergier Commission Report),

6

*Switzerland, National Socialism and the Second World War* 364 (2002).

While it is true, as Bakalar's expert continues, that "[i]n 1987, the Swiss Federal Supreme Court raised the standards of due diligence with respect to sales transactions involving *second-hand luxury automobiles*," and later to the antiquities business because "in these businesses stolen property is known to be frequent; therefore a heightened alertness may be expected from buyers in these sectors," and "[w]hile some Swiss legal commentators are of the opinion that the *art market* should also fall into this category of businesses at risk, the Swiss Federal Supreme Court has *not* extended the stricter standards to transactions with works of art," (A-714) (emphasis in original).

Nevertheless, Bakalar argues that Swiss law is "not blind to the rights of dispossessed former owners," and does not "reflect indifference to the possibility of theft." While this benign assessment of Swiss law has been disputed by others, *see e.g.*, Hector Feliciano, *The Lost Museum: The Nazi Conspiracy to Steal the World's Greatest Works of Art* 155 (1st ed. 1995), we have no occasion to address this issue. Instead, we simply note the obvious: Swiss law places significant hurdles to the recovery of stolen art, and almost "insurmountable" obstacles to the recovery of artwork stolen by the Nazis from Jews and others during World War II and the years preceding it. *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 at 159 ("[T]he legal and practical obstacles to the recovery of [stolen] art . . . are already substantial, if not insurmountable.").


**B. New York Law**

Unlike Switzerland, in New York, a thief cannot pass good title. *See Menzel v. List*, 49 Misc. 2d 300, 305 (N.Y. Sup. Ct. 1966), *modified as to damages*, 28 A.D.2d 516 (1st Dep't 1967), *rev'd as to modification*, 24 N.Y.2d 91 (1969); *see also Silsbury v. McCoon*, 3 N.Y. 379, 383-84 (1850).

This means that, under New York law, as *Menzel v. List* specifically held and one scholar observed, "absent other considerations an artwork stolen during World War II still belongs to the original owner, even if there have been several subsequent buyers and even if each of those buyers was completely unaware that she was buying stolen goods." Michelle I. Turner, Note, *The Innocent Buyer of Art Looted During World War II*, 32 Vand. J. Transnat'l L. 1511, 1534 (1999). The manner in which the New York rule is applied reflects an overarching concern that New York not become a marketplace for stolen goods and, in particular, for stolen artwork.

The leading New York case in this area is *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311 (1991), which principally addresses the issue of when a cause of action for replevin accrues, thus triggering the three-year statute of limitations. The case was decided against the backdrop of the New York market in stolen artwork. As one commentator has observed, "[b]ecause stolen art work can be very valuable, may eventually filter into the open market, and may be handled by the shadowy institution of the art gallery, art owners may be victimized by international trading in stolen art. Original owners, however, have only a few fragmentary and little-known mechanisms by which to register or recover their stolen art objects." Sydney M. Drum, Comment, DeWeerth v. Baldinger*: Making New York A Haven for Stolen Art?*, 64 N.Y.U. L. Rev. 909, 944 (1989). Moreover, they are "further disadvantaged by the art dealers' usual practice of not examining the sources of the art works in which they trade. While art dealers protest that they are only protecting the desire of their wealthy clients to remain anonymous, and that they are under no legal duty to inquire into the sources of art work they trade, such anonymity removes illegitimate transactions from needed scrutiny." *Id.* at 912-13.

The circumstances that Drum described are reflected in the market conditions described in

the opinion in *Lubell*. Indeed, the opening paragraph begins with the observation that "[t]he backdrop for this replevin action is the New York City art market, where masterpieces command extraordinary prices at auction and illicit dealing in stolen merchandise is an industry all its own." *Lubell*, 77 N.Y.2d at 314 (internal citation omitted). *Lubell* then observed that "New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value." *Id.* at 317. One aspect of that protection is the rule that a cause of action for replevin against the good-faith purchaser of stolen property "accrues when the true owner makes demand for return of the chattel and the person in possession of the chattel refuses to return it. Until demand is made and refused, possession of the stolen property by the good-faith purchaser for value is not considered wrongful" and the statute of limitations does not begin to run. *Id.* at 317-18 (internal citations omitted).

While the Court of Appeals acknowledged that "the demand and refusal rule is not the only possible method of measuring the accrual of replevin claims, it does appear to be the rule that affords the most protection to true owners of stolen property," and it rejected any suggestion that less protective measures should be adopted. *Id.* at 318. Thus, it declined to adopt a discovery rule "with the Statute of Limitations running from the time that the owner discovered or reasonably should have discovered the whereabouts of the work of art that had been stolen." *Id.* at 318-19. Indeed, the Court of Appeals observed that New York had already considered—and rejected—the adoption of such a rule. Specifically, a bill proposing that a museum would be immune from future claims once it "gave required public notice of acquisition and a three year statute of limitations period had passed," Drum, *supra*, at 936, was vetoed by Governor Mario Cuomo, who "stated that he had been advised by the State Department that the bill, if it went into effect, would have caused

9

New York to become 'a haven for cultural property stolen abroad since such objects [would] be immune from recovery under the limited time periods established by the bill.'" *Lubell,* 77 N.Y.2d at 319 (alteration in original).

The Court of Appeals observed that "[t]he history of this bill and the concerns expressed by the Governor in vetoing it, when considered together with the abundant case law spelling out the demand and refusal rule, convince us that that rule remains the law in New York and that there is no reason to obscure its straightforward protection of true owners by creating a duty of reasonable diligence." *Id.* In justifying this holding, the Court of Appeals observed that its decision was

> . . . in part influenced by [its] recognition that New York enjoys a worldwide reputation as a preeminent cultural center. To place the burden of locating stolen artwork on the true owner and to foreclose the rights of that owner to recover its property if the burden is not met would, we believe, encourage illicit trafficking in stolen art. Three years after the theft, any purchaser, good faith or not, would be able to hold onto stolen art work unless the true owner was able to establish that it had undertaken a reasonable search for the missing art. This shifting of the burden onto the wronged owner is inappropriate. In our opinion, the better rule gives the owner relatively greater protection and places the burden of investigating the provenance of a work of art on the potential purchaser.

*Id.* at 320.

This is not all the Court of Appeals held in *Lubell.* In the course of its opinion, it went on to agree with the Appellate Division, "for the reasons stated by that court, that the burden of proving that the painting was not stolen properly rests with [the possessor]." *Id.* at 321. Specifically, the Appellate Division had held that "an issue of fact exists as to whether the gouache was stolen, and that the burden of proof with respect to this issue is on defendant, it being settled that a complaint for wrongful detention contains every statement of fact essential to a recovery where it alleges the

10

plaintiff's ownership of the property and the defendant's possession and refusal on demand to deliver." *Solomon R. Guggenheim Found. v. Lubell,* 153 A.D.2d 143, 153 (1st Dep't 1990) (citing 23 N.Y. Jur. 2d, Conversion, and Action For Recovery of Chattel, §175, at 422). While the Appellate Division recognized that the burden it was placing on the good-faith possessor was an "onerous one," it held that "it well serves to give effect to the principle that persons deal with the property in chattels or exercise acts of ownership over them at their peril." *Id.* (internal citations omitted).

II

Against this backdrop, we turn to the issue of the appropriate choice of law and the issue of whether the Drawing was stolen. We address first the choice of law issue, because if Swiss law applies, it is immaterial whether the Drawing was stolen. Specifically, the district judge held: "Under New York's choice of law rules, questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer." 550 F. Supp. 2d at 550 (quoting *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, 1999 WL 673347, at *4-5 (S.D.N.Y. Aug. 30, 1999)). Accordingly, he concluded that "[t]he Court must apply the law of the country where title passed, if at all." (*Id.*) (internal quotation omitted). In adopting this choice-of-law rule, the district judge relied heavily on the opinion of Judge Mishler in *Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 845-46 (E.D.N.Y. 1981), *aff'd,* 678 F.2d 1150, 1157-58 (2d Cir. 1982).

*Elicofon* arose out of the theft of two Albrecht Duerer paintings possessed by the predecessor of the Kunstsammlungen zu Weimar, a German art museum. In July 1945, during the American occupation of the town of Weimar, the paintings were stolen from a castle where they had been

11

placed for safekeeping. Edward Elicofon purchased the paintings in good faith in 1946 from an ex-serviceman who appeared at his Brooklyn, New York residence and claimed that he had purchased them in Germany. *Elicofon*, 536 F. Supp. 2d at 830, 833. Some twenty years later, upon the discovery of the location of the Duerer paintings, the museum demanded their return. Elicofon refused, and the museaum sued to recover the paintings. Elicofon moved for summary judgment under a provision of German property law called *Ersitzung*, which allowed title to moveable property to be obtained by its good faith acquisition and possession without notice of a defect in title for a period of ten years from the date on which the rightful owner loses possession.

Judge Mishler concluded that it was unnecessary to reach the substantive issues in connection with German law "because under New York choice of law theory, German law is not applicable to determine whether Elicofon acquired title to the paintings." *Id.* at 845. Specifically, Judge Mishler observed in the language quoted above that "New York's choice of law dictates that questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer." *Id.* at 845-46. Because Elicofon purchased the paintings in New York, Judge Mishler concluded that New York law applied. Moreover, Judge Mishler concluded that even applying the more modern "interest analysis," New York substantive law still applied. *Id*.

The problem with the traditional situs rule, upon which Judge Mishler relied in part and upon which the district judge here relied exclusively, is that it no longer accurately reflects the current choice of law rule in New York regarding personal property. This is demonstrated by our decision in *Kahara Bodas Co., LLC v. Perusahaan Pertambangan Dan Gas Bumi Negara*, 313 F.3d 70, 85 n.15 (2d Cir. 2002). The plaintiff there argued that "the law of the situs of the disputed property

12

generally controls." *Id.* We declined to apply this rule because "the New York Court of Appeals explicitly rejected the 'traditional situs rule' in favor of interest analysis in *Istim*." *Id.* (citing *Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342, 346-47 (1991)). The interest analysis, which generally applies in all choice-of-law contexts, *see Istim*, 78 N.Y.2d at 347, begins with an examination of the contacts each jurisdiction has with the event giving rise to the cause of action. *See Kahara Bodas*, 313 F.3d at 85. "Once these contacts are discovered and analyzed they will indicate (1) that there exists no true conflict of laws, . . . as in most choice of law cases, or (2) that a true conflict exists, i.e., both jurisdictions have an interest in the application of their law." *In re Crichton's Estate*, 20 N.Y.2d at 135 n.8. "In property disputes, if a conflict is identified, New York choice of law rules require the application of an 'interests analysis,' in which 'the law of the jurisdiction having the greatest interest in the litigation [is] applied and . . . the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Kahara Bodas*, 313 F.3d at 85.

The alternative basis for Judge Mishler's holding in *Elicofon* provides a clear example of the application of the interest analysis. While the theft of the paintings occurred in Germany, he concluded correctly that the locus of the theft was simply not relevant to the interest underlying *Ersitzung*. *Elicofon*, 536 F. Supp. at 846. By contrast, "the contacts of the case with New York, *i.e.*, Elicofon purchased and holds the paintings here, are indeed relevant to effecting its interest in regulating the transfer of title in personal property in a manner which best promotes its policy." *Id.* Judge Mishler continued:

> In applying the New York rule that a purchaser cannot acquire good title from a thief, New York courts do not concern themselves with the question of where the theft took place, but simply whether one took place. Similarly, the residence of the true owner is not

13

significant[,] for the New York policy is not to protect resident owners, but to protect owners generally *as a means to preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods*. In finding that New York law governs the question of title, we hold that Elicofon did not acquire title under Ersitzung.

*Id.* (emphasis added).

Judge Mishler's analysis of the compelling New York interest to "preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods," which preceded the clear articulation of this interest by the Court of Appeals in *Lubell*, is relevant here. However the Drawing came into the possession of the Swiss art gallery, New York has a compelling interest in the application of its law. Indeed, it has applied its own law in a case comparable to this one without pausing to engage in a choice-of-law analysis. *See Menzel*, 49 Misc. 2d at 314-15. Simply stated, if the claim of Vavra and Fischer is credited, a stolen piece of artwork was delivered in New York to a New York art gallery, which sold it in New York to Bakalar. Indeed, Bakalar concedes that "a substantial part of the events or omissions giving rise to the claims herein" occurred in New York. (A-271.) These "events and omissions" made New York a "marketplace for stolen goods" and, more particularly, for stolen artwork, which was of special concern in *Lubell*. *See* 77 N.Y.2d at 320.

By contrast, the resolution of an ownership dispute in the Drawing between parties who otherwise have no connection to Switzerland does not implicate any Swiss interest simply because the Drawing passed through there. While the Drawing was purchased in Switzerland by a Swiss art gallery, which resold it within five months to a New York art gallery, the application of New York law here would not have any adverse effect on the Swiss art gallery. Nor would it affect any other

14

Swiss citizen or Swiss interest. The application of New York law may cause New York purchasers of artwork to take greater care in assuring themselves of the legitimate provenance of their purchase. This, in turn, may adversely affect the extra-territorial sale of artwork by Swiss galleries. The tenuous interest of Switzerland created by these circumstances, however, must yield to the significantly greater interest of New York, as articulated in *Lubell* and *Elicofon*, in preventing the state from becoming a marketplace for stolen goods. *Elicofon*, 536 F. Supp. at 846, *Lubell*, 77 N.Y.2d at 320. Thus, the Restatement (Second) of Conflict of Laws, which strongly tilts toward the situs rule, acknowledges that "[t]here will also be occasions when the local law of some state other than that where the chattel was situated at the time of the conveyance should be applied because of the intensity of the interest of that state in having its local law applied to determine the particular issue." Restatement (Second) of Conflict of Laws § 244 cmt. g (1971).

*Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, 1999 WL 673347 (S.D.N.Y. Aug. 30, 1999), upon which the district judge and Bakalar rely, does not compel a different result. The issue in that case was whether New York or French law would apply to a stolen artifact over which a citizen of France acquired title based on prescriptive possession after thirty years, as permitted under French law. The artifact was ultimately brought to New York, where the auction house, Christie's, Inc., auctioned it for $2 million. The Greek Orthodox Patriarchate of Jerusalem subsequently sued the purchaser and the prior French owner. The district judge granted summary judgment in favor of the defendants, on the ground that French law applied and on the ground of laches. The choice of law determination was based on the district judge's erroneous application of the old situs rule. Moreover, she declined to apply the public policy exception to that rule after determining that "[t]he thirty-year period for prescriptive possession under French law, however,

15

is a substantial length of time, not an indication of 'commercial indifference.'" *Id.* at *5. We need not say here whether the application of French law was correct, although we can say the situs rule on which the district judge relied is not consistent with the New York choice-of-law rule, and that Swiss law and the commercial practice it fosters is significantly different than that of France.[3]

While we have focused on the laws of Switzerland and New York, there is a third jurisdiction, the laws of which are arguably relevant. The Drawing began its journey in Austria, and Austrian courts have recognized that Vavra and Fischer are the heirs to Grunbaum's estate. Certainly, Austria has no interest in defeating the claim by these heirs against a United States citizen. Nevertheless, it is relevant that after World War II, Austria enacted a statute known as the Austrian Nullification Act, which provided that "[a]ny paid and unpaid legal transactions and other legal business which occurred during the German occupation of Austria will be considered null and void if they were contracted as a consequence of any political or economic influence exercised by the German Reich in order to deprive individuals or entities of property assets or interests owned by or due them as of March 13, 1938." NichtigkeitsG [Austrian Nullification Act] No. 106/1946, § 1 (Austria). The claims made on the basis of the Austrian Nullification Act were to be determined by subsequent legislation. While Austria enacted legislation relating to restitution of property from private parties—the Third Restitution Law BGB No. 54/1947, which the district judge observed

---

[3] According to Bakalar's expert, the Swiss Act on the International Transfer of Cultural Property ("CPTA") extended the statute of limitations for the return of stolen or lost cultural objects of a certain importance from five years to thirty years. The Act, however, does not apply to events that occurred prior to its enactment in June 2005. More significantly, the Act is hardly clear regarding which objects come within the Act's definition. Indeed, as Bakalar's expert opined, "[w]hether a cultural object is of importance in the sense of the CPTA is a question of interpretation, which must be answered on a case-by-case basis, taking into account the current opinion of art experts, the treatment of the object in scientific publications, etc. Objects of 'museum quality' are usually considered to be of importance in the sense of the Act." (A-707 n.11.)

16

imposed "a lesser burden for proving an illegitimate transfer of the Drawing in Austria," (A-347)—the statute expired on July 31, 1956. Nevertheless, an opinion of the Supreme Court of Austria, a translation of which is before us, declared that the Austrian Nullification Act is "in accordance with the immutable principles of our General Civil Code that nobody is obligated to adhere to a contract that was concluded on the basis of unfair and well-founded fear." Oberster Gerichtshof [OGH] [Supreme Court] Apr. 1, 2008, Docket No. 5 Ob 272/07x (citing Austrian Civil Code § 870). Moreover, the Supreme Court of Austria observed that "[e]ven though claims for expropriation of property within the meaning of the [Third Restitution Law] can no longer be asserted due to expiration of the time limit (July 31, 1956), [these principles] continue[] to be an integral part of Austrian law." *Id.*

Although it is unclear whether a cause of action comparable to the counterclaims of Vavra and Fischer against Bakalar could be successfully brought in Austria, allowing the claims to go forward under New York law is consistent with the principles underlying the decision of the Supreme Court of Austria. While Austria may have allowed its restitution-enabling act to elapse eleven years after the end of WWII in order to protect Austrian citizens, the present case does not involve a claim against any citizen of Austria.[4] Accordingly, we conclude that Austria has no

---

[4] Significantly, the Republic of Austria continues to investigate all works of art acquired between 1938-1945, which are now owned by it. Indeed, as the Austrian Embassy in the United States observed, "[w]orks of art not properly obtained will be returned to their original owners or their heirs." Austrian Press and Information Service, Austrian Holocaust Restitution, http://www.austria.org/content/view/414/1. Indeed, the International Bar Association recently reported that "The Austrian 'Commission for Provenance Research' issued 11 recommendations, recommending the transfer of the disputed objects (including paintings, prints, sculpture, ethnographical objects and musical instruments) to the heirs of the initial owners in ten cases, and in part in one case." Sarah Theurich, International Bar Association, *Art, Cultural Institutions and Heritage Law August 2009*, http://www.ibanet.org/Article/Detail.aspx? ArticleUid=C93CF2FA-F5F6-4A64-A7D1-8BD907FDF3DD; *see also* Holocaust Claims Processing Office, *Eight Artworks*

17

competing interest in the circumstances presented here.

In sum, we conclude that the district judge erred in holding that Swiss law, rather than New York law, applied here. Consequently, if, contrary to the holding of the district judge, the Drawing was stolen or otherwise unlawfully taken from Grunbaum, that circumstance would affect the validity of Bakalar's title.

                                    III

Notwithstanding its conclusion that the manner in which the Drawing was acquired from Grunbaum would not have affected the outcome of the case, the district judge found that the Grunbaum heirs had failed to produce "any concrete evidence that the Nazis looted the Drawing or that it was otherwise taken from Grunbaum." *Bakalar v. Vavra*, 2008 WL 4067335, at *8 (S.D.N.Y. Sept. 2, 2008). Our reading of the record suggests that there may be such evidence, and that the district judge, by applying Swiss Law, erred in placing the burden of proof on the Grunbaum heirs in this regard. Indeed, as discussed earlier, if the district judge determines that Vavra and Fischer have made a threshold showing that they have an arguable claim to the Drawing, New York law places the burden on Bakalar, the current possessor, to prove that the Drawing was not stolen. *See Lubell*, 77 N.Y.2d at 321 ("[T]he burden of proving that the painting was not stolen property rests with the [possessor]."). Moreover, should the district judge conclude that the Grunbaum heirs are entitled to prevail on the issue of the validity of Bakalar's title to the Drawing, the district judge should also address the issue of laches. This defense, which Bakalar raised in response to the counterclaim of the Grunbaum heirs, is one that New York law makes available to him.

---

*Returned to Rightful Heir From Austrian Museums with [Assistance] of Holocaust Claims Processing Office*, http://www.claims.state.ny.us/pr081002.htm.

18

Accordingly, for the reasons stated above, we vacate the judgment of the district court and remand the case for further proceedings, including, if necessary, a new trial.

IV

We turn briefly to the entirely collateral argument of the Grunbaum heirs that the district judge abused his discretion by limiting the discovery they sought for the purpose of filing a class action certification request. The order of the district judge directed non-parties Sotheby's, Inc., Christie's Inc., and Galerie St. Etienne, to provide "statistical information" necessary to address questions of class numerosity. Vavra and Fischer challenge the portion of the order excluding the identities of those who may have purchased works owned by Grunbaum. During a conference held on December 9, 2005, the district judge gave the following explanation for that limitation:

> [G]iven the fact that this is a motion for class certification, what is important for the movant in that case, is to address the questions of numerosity. And the discovery that you are taking, you can, with the discovery that you are taking, that can be satisfied by providing you with statistics on the buyers and sellers of the Grunbaum works, and with the location by state or country at the time of the transaction, and whether the purchaser was a museum, an art dealer, or a private individual. *There is no reason to learn the specific identities of those people at this time*.

(A-65-66.) (emphasis added).

The order did not in any way prevent the Grunbaum heirs from obtaining discovery sufficient to satisfy the numerosity requirement or any other requirement of Fed. R. Civ. P. 23(a). Indeed, it suggested implicitly that such information could be obtained at some later point. Under these circumstances, the district judge did not abuse his discretion by denying defendants' request for additional discovery. *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 233 (2d Cir. 2006) ("The amount of [class] discovery is generally left to the trial court's considerable discretion.").

19

## CONCLUSION

The judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.

EDWARD R. KORMAN, *District Judge*, separately concurring:

Often, when a verdict after a trial is reversed, other issues will be addressed which, though they do not affect the result, are likely to arise again on remand. While such a discussion may constitute dicta, it is justified by the desire to avoid the burden and expense that would result from the repetition of uncorrected error. Whether to undertake such an exercise is, of course, discretionary. While my colleagues, for perhaps understandable reasons, decline to engage in it, I take a different view and write to address more fully Part III of the panel opinion, which takes issue with the district judge's finding that the Grunbaum heirs had failed to produce "any concrete evidence that the Nazis looted the Drawing or that it was otherwise taken from Grunbaum." *Bakalar v. Vavra*, 2008 WL 4067335, at *8.

While the panel opinion observes that "[o]ur reading of the record suggests that there may be such evidence," **[Panel Opinion, ante at 18]** it does not say what that evidence is, nor does it discuss the legal principles applicable to what is essentially a mixed question of law and fact. The district judge is left to comb the record without assistance, looking for evidence he did not see the first time around, and without guidance as to the legal principles that make the evidence particularly relevant. I write to fill this gap.

Grunbaum was arrested while attempting to flee from the Nazis. After his arrest, he never again had physical possession of any of his artwork, including the Drawing. The power of attorney, which he was forced to execute while in the Dachau concentration camp, divested him of his legal control over the Drawing. Such an involuntary divestiture of possession and legal control rendered any subsequent transfer void.

"Under American law and the law of many foreign states there is only one scenario in which

21

a good-faith purchaser's claim of title is immediately recognized over that of the original owner. This scenario arises when the owner *voluntarily* parts with possession by the creation of a bailment, the bailee converts the chattel, and the nature of the bailment allows a reasonable buyer to conclude that the bailee is empowered to pass the owner's title." Patricia Youngblood Reyhan, *A Chaotic Palette: Conflict of Laws in Litigation Between Original Owners and Good-Faith Purchasers of Stolen Art*, 50 Duke L. J. 955, 971 (2001) (emphasis added). The principle to which Professor Reyhan alludes is codified in more limited form in section 2-403(2) of the Uniform Commercial Code, which was adopted by New York, and which provides that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." No such voluntary entrustment took place here. Nor did Grunbaum's flight from the Nazis constitute a voluntary abandonment.

Section 2-403(1) of the Uniform Commercial Code, which addresses principally the consequences of the transfer of title, rather than mere possession, provides that a person with voidable title has the power to transfer good title to a good-faith purchaser for value, and provides four examples of circumstances in which this rule applies. "The key to the voidable title concept appears to be that the original transferor voluntarily relinquished possession of the goods and intended to pass title." Franklin Feldman & Stephen E. Weil, *Art Law* § 11.1.3 (1986). The Feldman & Weil treatise continues: "He may have been defrauded, or the check he received may have bounced, or he may have intended to sell it to Mr. X rather than to Mr. Y, but, nevertheless, he intended to pass title. In such cases, the transferor has an option to void the sale, but the transferee can pass good title. A person who acquired the goods from a thief, however, has no title and consequently neither he nor successive transferees can pass ownership." *Id.*; *see also* Thomas M. Quinn, *Quinn's Uniform*

22

*Commercial Code Commentary and Law Digest* § 2–403[A][6] (2d ed., 2002). Grunbaum never voluntarily intended to pass title to the Drawing. On the contrary, the circumstances strongly suggest that he executed the power of attorney with a gun to his head.

Nevertheless, the district judge, relying on U.C.C. § 2-403(1), concluded that "Galerie St. Etienne was a seller with voidable title to the Drawing, having acquired it from Galerie Gutekunst in 1956," and that Bakalar, a good faith purchaser for value, acquired good title to the Drawing. 2008 WL 4067335, at *6. While the district judge did not identify the defect in the title acquired by Galerie Gutekunst, which rendered voidable the title it passed to Galerie St. Etienne, his conclusion that the title was voidable implicitly recognizes that there was some legal defect in the passage of title to the Drawing as it made its way from Grunbaum to the Galerie Gutekunst. Otherwise, the district judge would have had no basis to characterize as "voidable" the title the latter conveyed to the Galerie St. Etienne. This characterization, however, ignores the fact that, if the power of attorney signed by Grunbaum was involuntary, any subsequent transfer was void and not merely voidable.

This case is analogous to the circumstances in two reported cases. In *Vineberg v. Bissonnette*, 548 F.3d 50 (1st Cir. 2008), *aff'g* 529 F. Supp. 2d 300, 307 (D.R.I. 2007), the Nazis issued an edict directing the Jewish owner of an art gallery to liquidate the gallery and its inventory after determining that he "lacked the requisite personal qualities to be an exponent of German culture." *Id.* at 53. After unsuccessfully appealing this edict, the owner "surrendered to the inevitable," and consigned most of the affected works to a government-approved purveyor. *Id.* The consigned pieces, including a painting by Franz Xaver Winterhalter known as "Mädchen aus den Sabiner Bergen" ("Girl from the Sabine Mountains"), were auctioned at prices below their fair market value. Fearing for his life, the owner fled Germany shortly after the forced sale. Consequently, he never retrieved the auction

23

proceeds. *Id.* The district court had little trouble in concluding that the owner's "relinquishment of his property was anything but voluntary," 529 F. Supp. 2d at 307, and that holding was not challenged on appeal.

Similarly, in *Menzel v. List*, the Jewish owners of a painting by Marc Chagall entitled "Le Paysan a L'echelle" ("The Peasant and the Ladder") left their apartment in Brussels when they fled in March, 1941, before the oncoming Nazis. 49 Misc. 2d 300, 301-2 (N.Y. Sup. Ct. 1966), *modified as to damages*, 28 A.D.2d 516 (1st Dep't 1967), *rev'd as to modification*, 24 N.Y.2d 91 (1969). The painting was seized by the Nazis, who left a certification or receipt "indicating that the painting, among other works of art, had been taken into 'safekeeping.'" *Id.* at 301. The New York State Supreme Court Justice hearing the case concluded that the painting had not been abandoned because it did not constitute "a voluntary relinquishment of a known right." *Id.* at 305. The Justice continued: "The relinquishment here by the Menzels in order to flee for their lives was no more voluntary than the relinquishment of property during a holdup." *Id.* Consequently, he ordered the current possessor of the painting, and good-faith purchaser, to either return it to Mrs. Menzel or pay her $22,500, its fair value at the time of the case. Moreover, he also held that the good-faith purchaser could recover the $22,500 for breach of warranty of title from the Perls Galleries, from whom the painting was purchased. In so doing, the Justice explained:

> It is of no moment that Perls Galleries may have been a *bona fide* purchaser of the painting, in good faith and for value and without knowledge of the saga of the Menzels. No less is expected of an art gallery of distinction. Throughout the course of human history, the perpetration of evil has inevitably resulted in the suffering of the innocent, and those who act in good faith. And the principle has been basic in the law that a thief conveys no title as against the true owner.

24

*Id.* at 314-15 (citations omitted).[5]

Based on the historical record of the time, to which reference has already been made, the power of attorney Grunbaum signed in the fourth month of his confinement in Dachau does not appear to be any more voluntary a relinquishment of his legal interest in the Drawing than the acts discussed in *Vineberg* and *Menzel*. Bakalar's suggestion that the power of attorney constituted a voluntary entrustment of property to his wife is a proposition that remains for him to prove. Unless he does so, even if Mrs. Grunbaum "subsequently transferred the Drawing to her sister, Mathilde Lukacs, in 1938, to prevent it from falling into the hands of the Nazis," as Bakalar alleges, she could not convey valid title to the artwork. Significantly, the district judge made no finding that any entrustment for this purpose even took place.

On this score, Bakalar's amended complaint, which was filed on the eve of trial, posits two theories for what happened to the collection: 1) "that Elisabeth succeeded in hiding the [Drawing] from the Nazis prior to her deportation, and that her sister, Lukacs-Herzl, managed to take the collection with her into exile in Belgium," or 2) "that after the Grunbaum's apartment was aryanized by the Nazis in 1938, the family's library and art collection were purchased by a Viennese antiquarian bookseller who lived in the same neighborhood for approximately $90, and that the Viennese bookseller then either sold or gave the collection to Lukacs-Herzl at some point thereafter." (A-277.)

---

[5] The assumption that the Perls Galleries acted in good faith was undermined by its own conscious avoidance. As the New York Court of Appeals explained in the course of upholding the award of damages against it in favor of the good faith purchaser, the Perls Galleries was responsible for the position in which it found itself. Specifically, the Perls Galleries would not have been in that position if it had satisfied itself that it was getting good title from the art gallery from whom it purchased the artwork. Instead, the Perls testified "that to question a reputable dealer as to his title would be an 'insult.' Perhaps, [the Court of Appeals responded], but the sensitivity of the art dealer cannot serve to deprive the injured buyer of compensation for a breach which could have been avoided had the insult been risked." *Menzel*, 24 N.Y.2d at 98.

Of course, the second alternative assumes that the property was taken by the Nazis, and Bakalar acknowledges that, even under the first theory, scholars believe it is unlikely that Lukacs-Herzl could have saved the entire collection given the circumstances under which she left Austria. Indeed, Grunbaum's heirs offered expert evidence consistent with the premise that Lukacs-Herzl could not have removed or salvaged the paintings because "she was a Jewish woman who was interned in a Belgian work camp by the Nazis until 1944 after she fled Vienna together with her husband. It is more likely that a person like Kieslinger with direct ties to the Nazis took possession of the Grunbaum collection." (A-1273.) Significantly, neither of the two theories posited by Bakalar are predicated on the assumption that Mrs. Grunbaum voluntarily gave over Fritz Grunbaum's art collection to either Lukacs-Herzl or the Nazis who aryanized her apartment.

Nor do the district court's findings of fact support Bakalar's argument "that someone in the Grunbaum family more likely than not exported the Drawing from Vienna." The district judge merely speculated that "[t]he Drawing could have been one of the 417 drawings Elisabeth Grunbaum *possibly* exported . . . in 1938," or that the Drawing "could have been one of three drawings Lukacs's husband exported," or that "it could have been" one of the three watercolors exported by Lukacs's brother-in-law. 2008 WL 4067335, at *8 (emphasis added). These scenarios, based on pure speculation, do not constitute findings by a preponderance of the evidence that what "could have" happened, actually did happen.

Moreover, although Bakalar now claims that there is no "direct evidence that all of the Schiele art sold by Lukacs had once belonged to Fritz Grunbaum," or that "the Drawing belonged to Fritz Grunbaum prior to or during the war," there is significant circumstantial evidence that this artwork had belonged to him. Indeed, the district judge decided the case on this premise, and it was supported

26

by the deposition testimony of Eberhard Kornfeld, a partner at Galerie Gutekunst, and the trial testimony of Jane Kallir, the current director of the Galerie St. Etienne. Significantly, the Sotheby's Catalogue Description for the Drawing, February 8, 2005, which it prepared on Bakalar's behalf, listed the provenance as follows:

> Fritz Grunbaum, Vienna (until 1941)
> Elisabeth Grunbaum-Herzl, Vienna (widow of the above; until 1942; thence by decent)
> Mathilde Lukcas-Herzl (sister of the above)
> Gutekunst & Klipstein, Bern (on consignment from the above by 1956)
> Galerie St. Etienne, New York
> Norman Granz, New York
> Galerie St. Etienne, New York
> Acquired from the above by the present owner

(A-700.)

The admission by Sotheby's as to the initial provenance of the Drawing was confirmed by the judicial admission regarding its provenance in Bakalar's original complaint. *See Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). Specifically, Bakalar alleged in his complaint that:

> The Drawing has an established and documented provenance. It originally belonged to the collection Fritz Grunbaum, a well-known Vienesse cabaret performer. In 1938, the Nazis confiscated Grunbaum's residence and inventoried the contents of his art collection. Grunbaum was deported to Dachau, where he died in 1941. His wife, Elisabeth, died the following year. By all credible accounts, however, the Grunbaum art collection escaped confiscation by the Nazis, and the collection, including the Drawing, subsequently came in to the possession of Grunbaum's sister-in-law, Mathilde Lukacs-Herzl, after the war.

(A-217.) On the eve of trial, Bakalar moved to file an amended complaint, deleting his admission

as to the initial provenance of the Drawing, because it was based on information he obtained from Kornfeld, who had come to this conclusion in 1998 after he learned of Fritz Grunbaum's relationship to Lukacs-Herzl. While Bakalar was apparently permitted to file an amended complaint, Kornfeld and Kallir had sufficient expertise in the field to provide competent evidence on this score. Nor is it any answer to argue, as Bakalar does here, that their opinion was based on circumstantial rather than direct evidence. Moreover, notwithstanding the amended complaint, Bakalar's admission as to the provenance of the Drawing constitutes competent evidence that the trier of fact is free to consider, along with Bakalar's explanation for its inclusion in the original complaint.

In sum, my reading of the record suggests that there is substantial evidence to support the claim of the Grunbaum heirs that the Drawing was owned by Grunbaum and he was divested of possession and title against his will.